UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FRACTURELABS OÜ

       Plaintiff,                       CASE NO.: 24-cv-10249

vs.

JUMP TRADING, LLC,

       Defendant.

_____/

## **COMPLAINT**

Plaintiff FRACTURELABS OÜ ("FractureLabs"), by and through undersigned counsel, hereby sues Defendant JUMP TRADING, LLC ("Jump"), and alleges as follows:

### I.      STATEMENT OF THE CASE

1. This is an action for fraud and deceit, civil conspiracy, breach of contract, and breach of fiduciary duty to recover damages caused by Defendant Jump's scheme to defraud FractureLabs and manipulate the market in connection with the initial exchange offering of the DIO token.

2. Plaintiff FractureLabs is an independent game developer at the forefront of the crypto-gaming industry. Since 2018, FractureLabs has been developing Decimated, an online roleplaying game that incorporates its own cryptocurrency, the DIO token, into game play. Players can earn and spend DIO tokens within the game, and, because the DIO token is built on a blockchain, it can also be purchased and traded outside of the game like any other crypto asset.

3. In the fall of 2021, FractureLabs planned an initial exchange offering of DIO tokens to raise capital for the ongoing development of Decimated. Defendant Jump, an established trading



firm, offered to facilitate the initial exchange offering on behalf of FractureLabs. Jump agreed to provide FractureLabs with consultation and advice, to introduce FractureLabs to its contacts at various crypto-exchanges, and to serve as FractureLabs's market maker for the DIO token. Jump concealed its true intent to use the initial offering of DIO as an opportunity to "pump and dump" the token.

4.     Jump's representations and offers were a sham, intended to fraudulently induce FractureLabs to sign two agreements. In the first, FractureLabs agreed to lend 10 million DIO tokens (then worth $500,000) to one of Jump's wholly-owned subsidiaries, in advance of the initial exchange offering. Jump told FractureLabs it would use the borrowed tokens to act as FractureLabs's market maker. In the second, FractureLabs agreed to send 6 million DIO tokens (then worth $300,000) to the cryptocurrency exchange Huobi, now known as "HTX," to sell in an event called Huobi Primelist (HTX's version of an initial exchange offering). As part of the second agreement, on the advice of Jump, FractureLabs agreed to deposit with HTX 1.5 million USDT, a crypto token that is pegged to the value of a U.S. dollar. This deposited USDT would be forfeited to HTX if the price of DIO did not stay within certain parameters within the first 180 days of trading. Jump reviewed the pricing targets for DIO and advised FractureLabs to agree to them, telling FractureLabs that Jump would maintain the pricing parameters and that their purpose was to prevent FractureLabs from engaging in market manipulation.

5.     Once the agreements were in place, Jump and HTX used the initial offering of DIO to carry out a "pump-and-dump" scheme. HTX solicited online influencers to hype the DIO token. The price of DIO reached a high of $0.98 on HTX, at which point the 10 million DIO tokens borrowed by Defendant Jump were worth $9.8 million. Jump then systematically liquidated its DIO holdings, generating millions of dollars in revenue for itself while the price of DIO dropped



to $0.0053. Once Jump's sell-off caused the price of DIO to drop to a small fraction of its high, Jump re-purchased the heavily discounted tokens, now worth $53,000, and returned them to FractureLabs. It then terminated its agreement to serve as market maker for FractureLabs.

6.     Jump's dump of the DIO tokens caused the price to swing outside of the parameters that Jump had recommended for the token and that FractureLabs had agreed to in its listing agreement with HTX. Claiming that the pricing parameters had been violated, HTX then withheld and refused to refund the majority of FractureLabs's 1.5 million USDT deposit.

7.     The result of Defendant Jump's fraudulent scheme is that DIO was dramatically devalued, making it harder for FractureLabs to attract investors and interest, FractureLabs's own holdings of DIO were similarly devalued, FractureLabs lost the opportunity to benefit from its token trading at a higher price, Jump made millions of dollars for itself at FractureLabs's expense, and HTX retained and has refused to return most of FractureLabs's deposit and the proceeds from Huobi Primelist.

## II.     PARTIES, JURISDICTION, AND VENUE

8.     Plaintiff FractureLabs is a private limited company organized in Estonia. FractureLabs's sole shareholder, Stephen Arnold, is a citizen and resident of the United Kingdom.

9.     Defendant Jump is a Delaware limited liability company with its principal place of business in Chicago, Illinois. Defendant Jump is wholly owned by Jump Trading Holdings, LLC, a Delaware limited liability company with its principal place of business in Chicago, Illinois. Jump Trading Holdings, LLC, is wholly owned by Jump Financial, LLC, a Delaware limited liability company with its principal place of business in Chicago, Illinois. The members of Jump Financial, LLC, are the Paul A. Gurinas Trust and the William DiSomma Trust. Paul Gurinas is the trustee of



the Paul A. Gurinas Trust. William DiSomma is the trustee of the William DiSomma Trust. Paul Gurinas is a resident of Illinois. William DiSomma is a resident of Illinois.

10.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(2) because the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between a citizen of a State and a citizen or subject of a foreign state.

11.     This Court has personal jurisdiction over Jump because Jump has its principal place of business in Illinois and engages in substantial activity within Illinois.

12.     Venue is proper under 28 U.S.C. § 1391(b)(2) and (3) because Defendant Jump is headquartered and has its principal place of business in this District, some of the actions giving rise to the complaint took place in this District, and Defendant Jump is subject to this Court's personal jurisdiction in this District.

### III.     GENERAL ALLEGATIONS

13.     FractureLabs is an independent game developer at the forefront of the crypto-gaming industry. Crypto gaming uses blockchain technology to incorporate crypto assets—digital assets secured by a decentralized ledger known as a blockchain—into the gaming experience. Many crypto games incorporate their own currency in a play-to-earn model, meaning the players can earn the currency by playing the game. Crypto games may also use non-fungible tokens—a unique crypto asset that can be transferred, sold, or traded, but never duplicated or copied—to represent unique assets in the game, giving players actual ownership over those assets. Because the game's currency and tokens exist on a blockchain, players can buy, sell, and trade the gaming currency and assets outside of the game on crypto exchanges or other secondary marketplaces.

14.     Decimated, a crypto game, is the flagship product of FractureLabs and has been in development since 2018. Decimated is a roleplaying survival game set in a post-apocalyptic world,

4



where players must find resources, complete missions, and cooperate or compete with other players in order to ensure their character's survival.

15.     Decimated incorporates crypto assets into its game play. The game's currency is the DIO token, which is built on the Solana blockchain. Players can purchase DIO tokens on crypto exchanges or earn them by completing missions in the game. They can then spend the tokens on in-game resources. Decimated also uses non-fungible tokens to represent special vehicles, weapons, character customizations, and other special items in the game. These assets can be used in the game, collected, or traded on external crypto marketplaces.

16.     In the fall of 2021, FractureLabs launched a private sale of DIO tokens to raise money for the ongoing development of Decimated.

17.     During the private-sale period, investors could purchase DIO tokens directly from FractureLabs at a price ranging from $0.01 to $0.04 per token.

18.     During the private-sale period, FractureLabs was approached by Takashi Fujishima, a director at Jump Crypto, a division of Jump focusing on crypto assets. Through Fujishima, Jump began to cultivate a relationship with FractureLabs as an early investor. Jump represented itself as a sophisticated, active participant and liquidity provider in crypto markets.

19.     In November 2021, Jump, through its wholly owned subsidiaries JCDP-7 Digital Limited and J Digital 6 Cayman Limited, committed to purchasing $150,000 worth of DIO tokens through Simple Agreements for Future Tokens ("SAFTs").

20.     Also in November 2021, Fujishima introduced FractureLabs to his contacts at the Huobi Exchange, now known as "HTX." HTX also expressed interest in Decimated. Its investment division committed to purchasing $200,000 worth of DIO tokens through a SAFT. Panjun Wang,



HTX's investment director, committed to personally purchase $20,000 worth of DIO tokens through a SAFT.

21.     At the time it was committed to purchase DIO tokens, Jump was aware that FractureLabs intended to follow up the private sale with a public offering of DIO tokens on a cryptocurrency exchange.

22.     A crypto exchange is a marketplace for crypto assets, an online platform where users can buy and sell cryptocurrency or tokens. Starting around 2019, crypto exchanges began hosting "initial exchange offerings" on behalf of startup crypto companies. During an initial exchange offering, the exchange administers the sale of tokens to the exchange's users. Following the initial sale, the tokens are listed on the exchange and can immediately be bought and sold in the marketplace.

23.     Defendant Jump, through Fujishima, offered to advise and consult FractureLabs on the initial exchange offerings of DIO tokens and to act as FractureLabs's market maker once the DIO tokens were publicly available in the market.

24.     The role of a market maker is to provide liquidity by being a participant in the market for a token as both a buyer and a seller. Having a market maker ensures that there is always a willing buyer or seller to be able to satisfy the demand for the token. Crypto startups engage market makers to ensure liquidity for a newly introduced token.

25.     Fujishima used Jump's offers of investment, as well as Jump's credibility and position as an industry leader, to gain influence over FractureLabs.

26.     On December 17, 2021, Jump represented and proposed to FractureLabs that (1) Jump would act as FractureLabs's market maker for the DIO token; (2) Jump would use its own balance sheet to support the markets for the DIO token; and (3) Jump would act as consultant and



advisor to FractureLabs. The email proposal is attached to this Complaint as Exhibit A and incorporated herein.

27.     In the same email, Jump represented that FractureLabs would be able to access all of Jump's transactions and "continuously evaluate" Jump on its market making performance. Jump also represented that it worked with multiple crypto exchanges, including HTX, OKEx, Binance, KuCoin, Coinbase, Kraken, LMAX, Bitstamp, Gemini, Liquid, FTX, Bitfinex, Gate.io, Bybit, and Bittrex.

28.     FractureLabs initially intended to partner with the KuCoin exchange for its initial exchange offering. In mid-December, however, Fujishima recommended that FractureLabs move its initial exchange offering from KuCoin to HTX.

29.     Fujishima introduced FractureLabs to Will Wang, the Listing Director at HTX.

30.     On December 20, 2021, Wang proposed to FractureLabs that it participate in Huobi Primelist, HTX's platform for initial exchange offerings, which would take place the week of December 28, 2021.

31.     Because the proposed event was days away, Wang and Fujishima pressured FractureLabs to make a quick decision and, once FractureLabs agreed, to move forward with the Primelist event quickly.

32.     Especially because of the short timeframe, FractureLabs relied heavily on Fujishima and Jump, who had agreed to act as FractureLabs's advisor and consultant, in deciding to go forward with Huobi Primelist.

33.     FractureLabs also trusted HTX and Jump because both entities had agreed to become investors in FractureLabs and DIO, leading FractureLabs to believe that their interests were aligned—an increase in the value of DIO benefitted FractureLabs and its investors.

7



34. On December 23, 2021, FractureLabs and HTX entered into a "Cooperation Agreement" for offering the DIO token through Huobi Primelist. The agreement is attached to the Complaint as Exhibit B and incorporated herein. Under the Cooperation Agreement, FractureLabs agreed to pay HTX a marketing fee of 200,000 USDT and 100,000 DIO. HTX agreed to offer 300,000 USDT worth of DIO tokens (6 million DIO) through Primelist and agreed that the proceeds raised from the listing of those tokens would be deposited to FractureLabs's account. The Cooperation Agreement also required FractureLabs to make a security deposit of 1.5 million USDT.

35. Fujishima, acting as an advisor to FractureLabs, recommended that FractureLabs enter into the Cooperation Agreement. FractureLabs relied on Fujishima's advice in entering the Cooperation Agreement.

36. On December 23, 2021, FractureLabs deposited 1.5 million USDT into its account on HTX (the "deposit account") as required by the Cooperation Agreement.

37. On December 24, 2021, FractureLabs signed a "Letter of Undertaking" outlining additional terms relating to the 1.5 million USDT deposit. Under the Letter, the deposit was to be held in the deposit account on the HTX exchange. The account was in FractureLabs's name but could be controlled by HTX. The Letter of Undertaking is attached to the Complaint as Exhibit C and incorporated herein.

38. Wang and Fujishima represented to FractureLabs that the purpose of the deposit was to prevent FractureLabs from manipulating the market for the DIO token during the first 180 days of trading. To that end, the Letter set pricing parameters for the DIO token during the first 180 days of trading and granted HTX the right to restrict withdrawals from the deposit account during that time. If the pricing parameters were maintained, the deposit was to be returned to



FractureLabs's control. If the pricing parameters were not maintained, the letter allowed HTX to penalize FractureLabs by deducting portions of the deposit from the deposit account.

39.     Fujishima, acting as an advisor and consultant to FractureLabs, reviewed the pricing parameters in the Letter of Undertaking on behalf of FractureLabs.

40.     Fujishima told FractureLabs that Jump, as the market maker, could and would support the pricing parameters for the DIO token for the first 180 days of trading and that Jump would ensure that there were no huge price swings that would break those targets.

41.     FractureLabs only agreed to the Letter of Undertaking because it trusted Fujishima's advice and Jump's reputation, experience, and expertise. FractureLabs relied on Jump's representation that it would act in good faith to support the price parameters.

42.     On or about December 24, 2021, FractureLabs also signed a Master Loan Agreement with Jump's wholly owned subsidiary J Digital 6 Cayman Limited ("J Digital"). The Master Loan Agreement is attached to the Complaint as Exhibit D and incorporated herein. The Agreement provided that FractureLabs would loan 30 million DIO to J Digital, in three tranches of 10 million tokens each. The Agreement gave J Digital the option to repay the loan in either DIO tokens or in U.S. dollars. If repayment was made in U.S. dollars, then the Agreement listed a repayment price of $0.05 per token for the first tranche, $0.20 per token for the second tranche, and $0.40 per token for the third tranche.

43.     Fujishima represented that the borrowed tokens would be used on FractureLabs's behalf for the purpose of legitimate market making. FractureLabs relied on that representation.

44.     On or about December 27, 2021, HTX began to promote the Primelist launch of the DIO tokens. HTX offered prizes of up to 50,000 USDT to online influencers who made videos guiding their audience to "master the Huobi Primelist" and join the DIO token sale.



45.     On December 28, 2021, FractureLabs sent 6 million DIO tokens to HTX to offer for sale through Huobi Primelist, in accordance with the Cooperation Agreement.

46.     Also on December 28, 2021, FractureLabs sent 10 million DIO tokens to J Digital for the purpose of market making, in accordance with the Master Loan Agreement.

47.     According to HTX, the 6 million DIO tokens offered through Huobi Primelist sold immediately on December 29, 2021, for $0.05 per token, or $300,000. On January 8, 2022, HTX deposited 300,000 USDT, the proceeds from the Huobi Primelist, into the deposit account. The deposit account remained locked to prevent withdrawals.

48.     On December 29, 2021, the DIO token was listed on two crypto exchanges: HTX and Gate.io.

49.     Jump only traded the borrowed tokens on HTX and did not engage in market making on Gate.io.

50.     Within the first day of trading, the price of DIO reached a high of $0.98 on HTX.

51.     Despite the price trending upwards on the first day of trading, HTX reported to FractureLabs that its marketing campaign was only able to bring in 417 new registered users to participate in Primelist and that buying demand for the DIO token was low.

52.     On the first day of trading, when the price of DIO reached approximately $.90, Jump embarked on a mass sell-off of the borrowed DIO tokens. Despite demand being low and despite the price of DIO dropping with each trade, Jump continued its calculated sell-off of the borrowed DIO tokens.

53.     Within the first three days of trading on HTX, Jump traded over 4 million DIO in transactions totaling over $2 million. During that time frame, the price of DIO dropped from approximately $.98 to $.53.



54.     In the first month of trading, Jump's trades exceeded $6.9 million worth of DIO as the price continued to drop to approximately $.26.

55.     Jump continued to sell DIO until the price dropped to $0.0054.

56.     Jump delayed reporting its trading activity to FractureLabs until February 2, 2022, preventing FractureLabs from seeing or evaluating its trading activity.

57.     Even when Jump did provide information about its trading activity, the information was incomplete, and Jump refused to respond to FractureLabs's requests for more information regarding its suspicious trading activity.

58.     On June 24, 2022, FractureLabs requested that HTX unlock the funds in the deposit account, which now contained FractureLabs's deposit and the proceeds it was due from the Huobi Primelist sale.

59.     On June 28, 2022, HTX told FractureLabs that it would unlock the deposit account, but only after deducting 1.38 million USDT in penalties for violations of the pricing parameters within the Letter of Undertaking. On December 3, 2022, after lengthy negotiations, HTX permitted FractureLabs to withdraw 353,348.667561 USDT from the deposit account. The remainder of the account, worth approximately $ 1,388,820 at the time, remained locked.

60.     The value of the locked assets in the deposit account reached a high of $10,991,152.40, in December 2023. HTX continues to refuse to unlock the remainder of the deposit account and has continued to refuse to return FractureLabs's funds on grounds that pricing parameters in the Letter of Undertaking were violated.

61.     On August 16, 2023, Jump told FractureLabs that it planned to terminate its partnership with FractureLabs, return the borrowed 10 million tokens, and cease providing market making services for the DIO token.



62.     On August 22, 2023, and September 21, 2023, Jump returned the loaned DIO tokens to FractureLabs. On August 22, 2023, the value of DIO was approximately $0.006443 per token. On September 21, 2023, the value of DIO was approximately $0.005158 per token.

63.     Jump's mass liquidation of the DIO token drove the price from a high of $0.98 to a low of approximately $0.005.

64.     Jump's extreme devaluation of the DIO token harmed FractureLabs by shrinking the value of FractureLabs's DIO holdings, by reducing the valuation of the company, and by making it more difficult for FractureLabs to attract investors.

## CAUSES OF ACTION

### COUNT I
### FRAUD AND DECEIT

65.     FractureLabs sues Jump, and realleges and reasserts the allegations preceding the first count of this Complaint as if fully set forth herein.

66.     Jump engaged in a malicious and willful scheme to defraud FractureLabs and to use false representations and promises to induce FractureLabs to lend 6 million DIO tokens to J Digital so that Jump could enrich itself by manipulating the market for DIO upon its initial exchange offering.

67.     It was part of the fraudulent scheme that Jump represented itself as an investor, advisor, consultant, and market maker that would guide FractureLabs through the initial exchange offering of the DIO token. Jump told FractureLabs that it would be acting on FractureLabs behalf in communicating with the exchanges, negotiating the listing agreements, and in serving as FractureLabs's market maker for the DIO token. In fact, Jump never acted and never intended to act on behalf of FractureLabs.



68.    It was further part of the fraudulent scheme that Jump advised FractureLabs to list DIO with HTX through Huobi Primelist. Jump reviewed the pricing parameters for the DIO token that were incorporated in the Letter of Undertaking with HTX. Jump falsely stated that Jump could and would support the pricing targets in its role as market maker for the DIO token. In fact, Jump had no intention of supporting the pricing parameters within the Letter of Undertaking.

69.    It was further part of the fraudulent scheme that Jump represented to FractureLabs that it would provide market-making services for the DIO token on multiple crypto exchanges, including HTX, OKEx, Binance, KuCoin, Coinbase, Kraken, LMAX, Bitstamp, Gemini, Liquid, FTX, Bitfinex, Gate.io, Bybit, Bittrex. In fact, Jump intended to trade only on HTX where it could more easily control the price of DIO.

70.    It was further part of the fraudulent scheme that Jump advised and induced FractureLabs to loan 10 million DIO to J Digital in advance of DIO's initial exchange offering by claiming that the loaned DIO tokens would be used on FractureLabs's behalf for market making. In fact, Jump had no intention of using the loaned tokens on FractureLabs's behalf for legitimate market making.

71.    Jump's representations were false statements of material facts.

72.    Jump knew that its representations were false and fraudulent at the time they were made.

73.    Jump knew that its market manipulation and short sale of the DIO tokens would cause the price of DIO to swing outside of the pricing targets that Jump itself had recommended for the token. Jump's intentional market manipulation thus gave HTX cause to withhold FractureLabs's deposit on grounds that the DIO had missed its pricing targets and the currency had been manipulated.



74. FractureLabs reasonably and justifiably relied on Jump's false statements and representations by agreeing to participate in Huobi Primelist and by signing the Cooperation Agreement, Letter of Undertaking, and Master Loan Agreement. FractureLabs would not have signed these agreements but for Jump's fraudulent misrepresentations.

75. Jump's fraudulent scheme was malicious and willful and violated the trust and confidence FractureLabs had placed in Jump.

76. As a result of Jump's fraudulent scheme, FractureLabs has been damaged in an amount to be determined at trial.

WHEREFORE FractureLabs respectfully requests this Court enter judgment in favor of Plaintiff and against Defendant for damages, punitive damages, prejudgment and postjudgment interest, and award Plaintiff such other and further relief as this Court may deem just and proper.

## <u>COUNT II</u>
## CIVIL CONSPIRACY TO COMMIT FRAUD

77. FractureLabs sues Jump, and realleges and reasserts the allegations preceding the first count of this Complaint as if fully set forth herein.

78. Jump and HTX agreed and acted in concert in a scheme to defraud FractureLabs and to use false representations and promises to acquire control over the initial exchange offering of the DIO token, for the purpose of enriching themselves by manipulating the market for DIO upon its initial offering.

79. Jump and HTX each performed overt acts in furtherance of the conspiracy.

80. It was part of the fraudulent scheme that Jump represented itself as an investor, advisor, facilitator, and market maker that would guide FractureLabs through the initial exchange offering of the DIO token. Jump told FractureLabs that it would be acting on FractureLabs behalf in communicating with the exchanges, negotiating the listing agreements, and in serving as

14



FractureLabs's market maker for the DIO token. In fact, Jump never acted and never intended to act on behalf of FractureLabs.

81.     It was further part of the fraudulent scheme that Jump introduced FractureLabs to HTX and that HTX represented itself as an interested investor in FractureLabs.

82.      It was further part of the fraudulent scheme that Jump and HTX advised FractureLabs to list DIO through a Huobi Primelist event on December 29, 2021. Jump and HTX used this deadline to create a false sense of urgency and pressure FractureLabs to act quickly and turn over control of the initial exchange offering to Jump and HTX.

83.     It was further part of the fraudulent scheme that Jump and HTX used false representations and promises to induce FractureLabs to deposit 1,500,000.00 USDT into the deposit account with HTX and to agree that the deposit would be forfeited to HTX if the DIO token did not meet certain pricing targets within the first 180 days of listing. Jump reviewed and approved of the pricing parameters for the DIO token that were incorporated in the Letter of Undertaking with HTX. Jump and HTX falsely stated the purpose of the deposit was to prevent FractureLabs from manipulating the market for DIO tokens. Jump and HTX falsely stated that Jump could and would support the pricing targets in its role as market maker for the DIO token. Jump falsely stated that it would ensure that there were no huge price swings in the price of DIO. In fact, the pricing parameters were impossible to meet and HTX and FractureLabs did not intend for the price of DIO to stay within the price parameters. Jump and HTX knew that DIO would not meet the agreed-upon pricing targets because they would be manipulating and controlling the price of DIO upon its initial listing for the purpose of enriching themselves.

84.     It was further part of the fraudulent scheme that Jump represented to FractureLabs that it would provide legitimate market-making services on behalf of FractureLabs and advised



FractureLabs to loan 10 million DIO to Jump's wholly owned subsidiary, J Digital 6 Cayman Limited, in advance of DIO's initial exchange offering, for the purpose of market making and for the purpose of maintaining the agreed-upon pricing targets for DIO. In fact, Jump had no intention of acting on FractureLabs's behalf as a market maker, nor did it intend to maintain the pricing parameters.

85.     It was further part of the fraudulent scheme that Jump represented it would support the market for DIO on multiple exchanges. In fact, Jump had no intention of doing so and instead intended to work only with HTX so that Jump and HTX could exert maximum control over the price of DIO upon its initial listing.

86.     Jump and HTX's representations were false statements of material facts.

87.     Jump and HTX knew that their representations were false and fraudulent at the time they were made.

88.     Jump and HTX additionally knew that Jump's short sale of the DIO tokens would cause the price of DIO to swing outside of the pricing targets that Jump had recommended for the token. Jump's intentional market manipulation thus gave HTX cause to withhold FractureLabs's deposit in the HTX "market-making account" on grounds that the DIO had missed its pricing targets and the currency had been manipulated.

89.     FractureLabs reasonably and justifiably relied on HTX and Jump's false statements and representations by agreeing to participate in Huobi Primelist and by signing the Cooperation Agreement, Letter of Undertaking, and Master Loan Agreement. FractureLabs would not have signed these agreements but for HTX and Jump's fraudulent misrepresentations.

90.     Jump and HTX's fraudulent scheme was malicious and willful and violated the trust and confidence FractureLabs had placed in Jump.



91.     As a result of Jump and HTX conspiring to defraud FractureLabs, FractureLabs has been damaged in an amount to be determined at trial.

WHEREFORE FractureLabs respectfully requests this Court enter judgment in favor of Plaintiff and against Defendant for damages, punitive damages, prejudgment and postjudgment interest, and award Plaintiff such other and further relief as this Court may deem just and proper.

## COUNT III
## BREACH OF CONTRACT

92.     FractureLabs sues Jump, and realleges and reasserts the allegations preceding the first count of this Complaint as if fully set forth herein.

93.     FractureLabs and Jump entered into a valid and enforceable contract for Jump to provide market-making services on behalf of FractureLabs for the DIO token.

94.     As part of the agreement, Jump agreed to act on behalf of FracureLabs to provide market making services for the DIO token, to maintain the price of DIO within the pricing parameters set forth in the Letter of Undertaking, and to use its own books to support the market for DIO.

95.     FractureLabs performed all obligations and conditions precedent required by the contract.

96.     Jump breached the contract by failing to use the loaned DIO tokens on FractureLabs's behalf, by failing to provide legitimate market making services for the DIO token, and by failing to maintain the agreed-upon pricing targets for the DIO token set forth in the Letter of Undertaking.

97.     Jump's breach caused FractureLabs damages in an amount to be determined at trial.



WHEREFORE FractureLabs respectfully requests this Court enter judgment in favor of Plaintiff and against Defendant for damages, prejudgment and postjudgment interest, and award Plaintiff such other and further relief as this Court may deem just and proper.

**COUNT IV**
**BREACH OF FIDUCIARY DUTY**

98.     FractureLabs sues Jump, and realleges and reasserts the allegations preceding the first count of this Complaint as if fully set forth herein.

99.     Jump owed a fiduciary duty to FractureLabs because FractureLabs reposed special trust in Jump to consult and advise FractureLabs in the initial exchange offering of the DIO token and to serve as a market maker on FractureLabs's behalf for the DIO token. Jump accepted that trust.

100.    Jump owed a fiduciary duty to FractureLabs because Jump agreed to act on behalf of FractureLabs as a market maker for the DIO token and in that capacity agreed to support the market for the DIO token and to maintain the agreed-upon pricing targets for the DIO token during the first 180 days of listing.

101.    Jump breached its fiduciary duty by wrongfully engaging in market manipulation of the DIO token and by short selling borrowed DIO tokens to enrich itself, while knowingly, recklessly, or negligently disregarding that its trading activity was causing the price of DIO to swing outside of the parameters set in the Letter of Undertaking.

102.    Jump breached its fiduciary duty by profiting from the sale of DIO tokens at the expense of FractureLabs and by exploiting the high price of DIO by engaging in a mass sell-off its borrowed DIO tokens, which tokens were intended solely for the purpose of maintaining liquidity in the market. In doing so Jump usurped a corporate opportunity belonging to FractureLabs.



103.    Jump breached its fiduciary duty by giving negligent and dishonest advice to FractureLabs in connection with the initial exchange offering of the DIO token, including by recommending that FractureLabs agree to the Letter of Undertaking and the Master Loan Agreement.

104.    Jump wrongfully profited from its breach of its fiduciary duty in an amount to be determined at trial.

105.    Jump's breach of its fiduciary duty caused FractureLabs damages in an amount to be determined at trial.

WHEREFORE FractureLabs respectfully requests this Court enter judgment in favor of Plaintiff and against Defendant for damages, disgorgement of profits, prejudgment and postjudgment interest, and award Plaintiff such other and further relief as this Court may deem just and proper.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs pray for relief as follows:

1.    Compensatory Damages;

2.    Punitive Damages;

3.    Disgorgement of Profits;

4.    An award of interest on such sums at the highest rate allowed pursuant to law; and

5.    For such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.



Respectfully submitted,

By: /s/ *Deanna Lee Oswald*
Deanna Oswald, Esq.
Florida Bar No. 72621
Benjamin H. Brodsky, Esq.
Florida Bar No. 73748
BRODSKY FOTIU-WOJTOWICZ, PLLC
*Counsel for Plaintiff*
200 SE 1st Street, Suite 400
Miami, Florida 33131
Tel: 305-503-5054
bbrodsky@bfwlegal.com
deanna@bfwlegal.com
docketing@bfwlegal.com